**No. 26-11795**

# United States Court of Appeals

*for the*

# Eleventh Circuit

LAURA LOOMER

*Plaintiff-Appellant,*

– v. –

BILL MAHER, HOME BOX OFFICE, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(HONORABLE JAMES S. MOODY, JR.)

## BRIEF OF APPELLEES

YELAN ESCALONA
SHULLMAN FUGATE PLLC
201 South Biscayne Boulevard, 28th Floor
Miami, Florida 33131
(305) 928-2429

RACHEL E. FUGATE
SHULLMAN FUGATE PLLC
100 South Ashley Drive, Suite 600
Tampa, Florida 33602
(813) 935-5098

KATHERINE M. BOLGER
ALEXANDRA PERLOFF-GILES
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
(212) 489-8230

*Counsel for Defendants-Appellees*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (396606)

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellees believe that oral argument is not necessary. The District Court's well-reasoned decision granting summary judgment to Defendants-Appellees may be affirmed on the briefing based on the application of well-established legal principles and authority.

# TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT ....................................................................1

JURISDICTIONAL STATEMENT ..............................................................4

COUNTER-STATEMENT OF ISSUES PRESENTED ..................................4

COUNTER-STATEMENT OF THE CASE .....................................................5

I. Factual Background.....................................................................5

A. Defendants .........................................................................5

B. Plaintiff.................................................................................6

1. Plaintiff's Reputation Before The Episode.......................6

2. Plaintiff's Close Relationship with President Trump Before the Episode..............................................8

C. The September 13 Episode ......................................................13

D. Plaintiff's Reputation Following the September 13 Episode..................................................................................15

II. Procedural History.........................................................................17

STANDARD OF REVIEW ...........................................................................18

SUMMARY OF ARGUMENT .......................................................................18

ARGUMENT ..............................................................................................20

I. The Motion To Dismiss Decision Provides No Basis For Appeal .....20

II. The Remark Is Not An Actionable Statement of Fact ........................21

A. The Context Of The Remark Establishes It Was A Joke..........22

B. Maher Was Offering Opinion, Not Making A Statement Of Fact.......................................................................................28

C. The Remark Is Rhetorical Hyperbole .....................................32

III. The Defamation-By-Implication Claim Also Fails.............................34

IV. Plaintiff Cannot Show Defendants Acted With Actual Malice ..........37

V. Plaintiff Cannot Meet Her Burden to Show Damage .........................43

CONCLUSION ..........................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aldana v. Del Monte Fresh Produce N.A., Inc.*,
578 F.3d 1283 (11th Cir. 2009) ....................................................................20

*Almanzar v. Kebe*,
2021 WL 5027798 (N.D. Ga. July 8, 2021) ......................................................24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................18, 37, 38

*Barnes v. Horan*,
841 So. 2d 472 (Fla. 3d DCA 2002)..................................................................32

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ...........................................................................29

*Block v. Matesic*,
2023 WL 3816693 (S.D. Fla. June 5, 2023).......................................................36

*Block v. Matesic*,
789 F. Supp. 3d 1131 (S.D. Fla. 2025), *appeal dismissed*,
2026 WL 810430 (11th Cir. Mar. 24, 2026) ......................................................36

*Border Collie Rescue, Inc. v. Ryan*,
418 F. Supp. 2d 1330 (M.D. Fla. 2006).............................................................46

*Brown v. Ent. Merch. Ass'n.*,
564 U.S. 786 (2011)..........................................................................................45

*Busch v. Viacom Intern., Inc.*
477 F. Supp. 2d 764 (N.D. Tex. 2007) ..............................................................23

*Byrd v. Hustler Magazine, Inc.*,
433 So. 2d 593 (Fla. 4th DCA 1983)..................................................................21

*Corsi v. Newsmax Media, Inc.*,
519 F. Supp. 3d 1110 (S.D. Fla. 2021) ..................................................35, 37, 44

*Counterman v. Colorado*,
600 U.S. 66 (2023)....................18

*Dershowitz v. Cable News Network, Inc.*,
153 F.4th 1189 (11th Cir. 2025)....................37

*Dibble v. Avrich*,
2015 WL 12532615 (S.D. Fla. July 29, 2015)....................20

*Dockery v. Fla. Democratic Party*,
799 So. 2d 291 (Fla. 2d DCA 2001)....................41, 43

*Dougherty v. Harvey*,
317 F. Supp. 3d 1287 (N.D. Ga. 2018)....................29

*Dworkin v. Hustler Mag. Inc.*,
867 F.2d 1188 (9th Cir. 1989)....................23

*Edelstein v. WFTV, Inc.*,
798 So. 2d 797 (Fla. 4th DCA 2001)....................43

*Egwuatu v. Burlington Coat Factory Warehouse Corp.*,
2011 WL 2413833 (M.D. Fla. June 10, 2011)....................46

*Farah v. Esquire Mag.*,
736 F.3d 528 (D.C. Cir. 2013)....................24

*Flynn v. Cable News Network, Inc.*,
2023 WL 5985193 (M.D. Fla. Feb. 22, 2023)....................35

*Fortson v. Colangelo*,
434 F. Supp. 2d 1369 (S.D. Fla. 2006)....................22, 33

*From v. Tallahassee Democrat, Inc*,
400 So.2d 52 (Fla. 1st DCA 1981)....................22

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)....................37

*Gottwald v. Bellamy*,
2011 WL 2446856 (M.D. Fla. June 15, 2011)....................32

*Graham v. UMG Recordings, Inc.*,
2025 WL 2879607 (S.D.N.Y. Oct. 9, 2025) .......... 33

*Grayson v. No Labels, Inc.*,
2022 WL 1701853 (M.D. Fla. May 20, 2022) .......... 42

*Grlpwr, LLC v. Rodiguez*,
2023 WL 5666203 (N.D. Fla. Aug. 25, 2023) .......... 46

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) .......... 42, 43

*Hay v. Indep. Newspapers, Inc.*,
450 So. 2d 293 (Fla. 2d DCA 1984) .......... 30, 31

*Haynes v. Alfred A. Knopf, Inc.*,
8 F.3d 1222 (7th Cir. 1993) .......... 28

*HBO v. Huckabee*,
995 S.W.2d 152 (Tex. App. 1998) .......... 42

*Horsley v. Rivera*,
292 F.3d 695 (11th Cir. 2002) .......... 22

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) .......... 39, 41

*Hustler Mag., Inc. v. Falwell*,
485 U.S. 46 (1988) .......... 19, 32, 33

*Jacoby v. CNN*,
537 F. Supp. 3d 1303 (M.D. Fla. 2021),
*aff'd*, 2021 WL 5858569 (11th Cir. Dec. 10, 2021) .......... 35

*Jews For Jesus, Inc. v. Rapp*,
997 So. 2d 1098 (Fla. 2008) .......... 19, 34, 35, 44

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) .......... 45

*Keller v. Miami Herald Publ'g Co.*,
778 F.2d 711 (11th Cir. 1985) .......... 21

*Klayman v. City Pages*,
2015 WL 1546173 (M.D. Fla. Apr. 3, 2015),
*aff'd,* 650 F. App'x 744 (11th Cir. 2016) ....................................................39, 43

*Lapine v. Seinfeld*,
31 Misc. 3d 736 (N.Y. Sup. Ct. 2011)..............................................................23

*Levan v. Capital Cities/ABC, Inc.*,
190 F.3d 1230 (11th Cir. 1999) .......................................................................37

*Levin v. McPhee*,
119 F.3d 189 (2d Cir. 1997) ............................................................................28

*Lovingood v. Discovery Commc'ns, Inc.*,
275 F. Supp. 3d 1301 (N.D. Ala. 2017),
*aff'd*, 800 F. App'x 840 (11th Cir. 2020) .........................................................39

*Markle v. Markle*,
2024 WL 1075339 (M.D. Fla. Mar. 12, 2024),
*appeal filed* (24-11091) (11th Cir. Apr. 9, 2024) ..............................................34

*Marshall v. Planz*,
13 F. Supp. 2d 1246 (M.D. Ala. 1998)..............................................................28

*Mazur v. Baraya*,
275 So. 3d 812 (Fla. 2d DCA 2019).................................................................45

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ....................................................................37, 39

*Mid-Fla. Television Corp. v. Boyles*,
467 So. 2d 282 (Fla. 1985) ........................................................................37, 43

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990)........................................................................................21, 33

*Moore v. Cecil*,
174 F.4th 862 (11th Cir. 2026), *pet. for cert. filed sub nom.*,
*Moore v. Senate Majority PAC* (26-122) (U.S. July 28, 2026)...........................38

*Munro v. Fairchild Tropical Botanic Garden, Inc*.,
2022 WL 452257 (S.D. Fla. Jan. 13, 2022),
*appeal dismissed,* 2023 WL 5426754 (11th Cir. Aug. 23, 2023)........................20

*Myers v. Bos. Mag. Co.*,
380 Mass. 336 (1980) ....................23

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................18, 37, 48

*New Times, Inc. v. Isaacks*,
146 S.W.3d 144 (Tex. 2004) ....................19, 23

*Nichols v. Moore*,
477 F.3d 396 (6th Cir. 2007) ....................44

*Pierce v. Warner Bros. Ent., Inc.*,
237 F. Supp. 3d 1375 (M.D. Ga. 2017) ....................23

*Polygram Recs., Inc. v. Super. Ct.*,
170 Cal. App. 3d 543 (1985) ....................23, 27, 34

*Rasmussen v. Collier Cnty. Publ'g Co.*,
946 So.2d 567 (Fla. 2d DCA 2006)....................30, 31

*Readon v. WPLG, LLC*,
317 So.3d 1229 (Fla. 3rd DCA 2021)....................40

*Reed v. Chamblee*,
2023 WL 6292578 (M.D. Fla. Sept. 27, 2023),
*aff'd*, 2025 WL 1874638 (11th Cir. July 8, 2025)....................37

*Riley v. Moyed*,
529 A.2d 248 (Del. 1987) ....................23

*Scott v. Moon*,
2019 WL 332415 (W.D. Va. Jan. 24, 2019),
*aff'd*, 773 F. App'x 138 (4th Cir. 2019) ....................33

*Shriteh v. NYP Holdings, Inc.*,
2026 WL 386705 (M.D. Fla. Feb. 11, 2026)....................44

*Smith v. Cuban Am. Nat'l Found.*,
731 So. 2d 702 (Fla. 3d DCA 1999)....................22

*Smith v. Young*,
2013 WL 1729000 (N.D. Fla. Mar. 6, 2013),
*R & R adopted*, 2013 WL 1729096 (N.D. Fla. Apr. 22, 2013) ..........................27

*State Farm Mut. Auto. Ins. Co. v. Complete Care Centers, LLC*,
2023 WL 4854724 (M.D. Fla. Jan. 11, 2023) ..................................................20

*Stevenson v. Cyprus Amaz Minerals Co.*,
2018 WL 8608281 (M.D. Fla. June 29, 2018) ..................................................27

*StopLoss Specialists, LLC v. Vericlaim, Inc.*,
340 F. Supp. 3d 1334 (N.D. Ga. 2018)............................................................29

*Street v. Nat'l Broad. Co.*,
512 F. Supp. 398 (E.D. Tenn. 1977),
*aff'd*, 645 F.2d 1227 (6th Cir. 1981) ..............................................................44

*Tillett v. BJ's Wholesale Club, Inc.*,
2010 WL 11507322 (M.D. Fla. July 30, 2010) ................................................31

*Time, Inc. v. Hill*,
385 U.S. 374 (1967)..........................................................................................45

*Tobinick v. Novella*,
2015 WL 1191267 (S.D. Fla. Mar. 16, 2015) ..................................................46

*Transamerica Leasing, Inc. v. Inst. of London Underwriters*,
267 F.3d 1303 (11th Cir. 2001) ........................................................................44

*Turner v. Wells*,
198 F. Supp. 3d 1355 (S.D. Fla. 2016)............................................................30

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ..........................................................19, 28, 37

*Wolfson v. Kirk*,
273 So. 2d 774 (Fla. 4th DCA 1973)...............................................................37

*Wound Care Concepts, Inc. v. Vohra Health Servs. P.A.*,
2022 WL 320952 (S.D. Fla. Jan. 28, 2022)......................................................46

*Wright v. Farouk Sys., Inc.*,
701 F.3d 907 (11th Cir. 2012) ..........................................................................18

*Zelinka v. Am. Healthscan, Inc.*,
763 So. 2d 1173 (Fla. 4th DCA 2000) .......... 46

**Statutes**

28 U.S.C. § 1291 .......... 4

28 U.S.C. § 1332 .......... 4

Florida Statute § 770.01 .......... 17, 45, 46

**Other Authorities**

Fed. R. Civ. P. 56 .......... 18, 27

## PRELIMINARY STATEMENT

This lawsuit arises out of a joke made by comedian Bill Maher during an episode of the HBO original series *Real Time with Bill Maher* ("*Real Time*") on September 13, 2024 (the "Episode"). Like many of the comments made during that (and every) episode of *Real Time*, the joke offered a humorous reflection on one aspect of that week's news cycle. That particular week, Plaintiff's close relationship and frequent sightings with then-presidential candidate Donald Trump were all over the news. Countless reports and social media posts remarked on the fact that she was photographed with President Trump on his plane, at his side at a 9/11 memorial, and as his guest to the debate with Kamala Harris. Reporters and commentators recirculated other photos and videos of Plaintiff and President Trump together—many of which Plaintiff herself had shared and captioned with loving commentary and "heart-eyes" emojis. The press also scrutinized Plaintiff's history of incendiary rhetoric, her influence over the President, and reactions from staffers to her presence in his inner circle, prompting musings about a possible romantic relationship between them.

For comedians such as Maher, the repeated public appearances of an attractive younger woman at a presidential candidate's side were natural "fodder for comedy." Dkt. 150-3 at 184:6–25. As Maher put it, "For me not to have

commented on that, I would have been remiss in doing my job." *Id.* at 18:11–14. So, at the end of that week, during the September 13 Episode, he remarked:

> Here's my question, because she said – Laura Loomer said, "Taylor Swift," she believes, "is in an arranged relationship with Travis Kelce to influence the 2024 election." I think maybe Laura Loomer's in an arranged relationship to affect the election, because she's very close to Trump. She's 31, looks like his "type." We did an editorial here a few years ago . . .. It was basically "Who's Trump Fucking?" Because I said, you know, it's not nobody. He's been a dog for too long—and it's not Melania. I think we may have our answer this week. I think it might be Laura Loomer. I'm just saying.

Dkt. 150-1 at 8305–06 (the "Remark"). Everyone understood that the Remark was a joke—one that echoed other jokes made on other shows and social media around the same time. But Loomer nevertheless filed this lawsuit.

This Court should affirm the grant of summary judgment because, as the District Court correctly found, the evidence compels dismissal of Plaintiff's defamation per quod, defamation per se, and defamation by implication claims for multiple independent reasons.

*First*, the Remark was not an actionable statement of fact. Maher, an award-winning comedian, testified in no uncertain terms that he told a joke and did not intend the Remark to be a statement of fact. Moreover, the record evidence shows that *Real Time* bears all the hallmarks of late-night comedy. In that context, a reasonable viewer would have understood Maher to be making a joke based on that week's headlines. Even if it were not understood by the audience to be a joke,

the Remark would certainly have been understood as either rhetorical hyperbole or an opinion based on known or disclosed facts, both of which are fully protected under the First Amendment and occur frequently on *Real Time*. Moreover, because Plaintiff did not plead true statements supporting the allegedly defamatory implication, her duplicative defamation by implication claim also fails.

*Second*, Plaintiff did not carry her burden of establishing that Maher acted with actual malice (i.e., a subjective awareness of probable falsity). On the contrary, Plaintiff herself testified that Maher believed she might have been sleeping with President Trump.

*Finally*, there is no dispute of material fact as to damages. A libel plaintiff suing a media defendant must prove damages under Florida law. As the District Court recognized, Plaintiff did not identify "a single individual who believed that she was sleeping with President Trump because of the Episode or a single relationship that was damaged as a result of the Episode"; she did not offer "any expert testimony quantifying her reputational harm"; and, far from offering proof her income declined, she "testified that her income increased in 2024 compared to prior years." Dkt. 194 at 17.

Plaintiff's primary argument on appeal appears to be that she finds it "inexplicabl[e]" that the District Court "reversed course" in granting summary judgment after denying a motion to dismiss. Appellant's Br. 3. But there is nothing

"inexplicable" about the District Court permitting the case to go to discovery and then determining, based on the evidentiary record, that Plaintiff did not adduce facts sufficient for a jury to rule in her favor.

With no genuine issues of material fact that could support Plaintiff's defamation claims, the District Court correctly entered summary judgment in favor of Defendants, and this Court should affirm.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity between the parties.

This Court has subject matter jurisdiction under 28 U.S.C. § 1291 because the order appealed from is a final decision disposing of all of Plaintiff's claims.

## COUNTER-STATEMENT OF ISSUES PRESENTED

Whether the District Court correctly granted Defendants' motion for summary judgment and dismissed Plaintiff's defamation, defamation per se, and defamation by implication claims, where Plaintiff failed to present evidence establishing that (1) reasonable viewers understood the Remark to be a statement of fact, (2) the concededly true facts created the alleged implication, (3) Defendants knew the Remark was false or probably false, or (4) Plaintiff suffered any actual injury attributable to the Remark.

## COUNTER-STATEMENT OF THE CASE

### I. Factual Background

#### A. Defendants

Bill Maher is a celebrated comedian and satirist. *See* Dkt. 151 at ¶ 4; Dkt. 150-61; Dkt. 150-3 at 11:24–12:6; Dkt. 150-4 at 100:5–6. He began his career doing stand-up comedy, eventually doing stints on *The Tonight Show* and working as a comedic actor. Dkt. 150-3 at 10:22–11:13. From 1993 to 2002, he hosted *Politically Incorrect*, a topical comedy show that aired first on Comedy Central and later on ABC. *See* Dkt. 150-4 at 20:10–13; Dkt. 150-3 at 13:6–7. Maher performed 13 stand-up comedy specials distributed by HBO and, until recently, toured the country performing stand-up comedy. *See* Dkt. 150-3 at 11:11–12:6; Dkt. 150-4 at 100:5–6.

Since 2003, Maher has hosted *Real Time*, an "award-winning talk/comedy series," which airs Fridays at 10 P.M. EST on HBO. *See* Dkt. 151 at ¶¶ 7–8. Each episode of *Real Time* begins with an opening monologue, followed by a one-on-one interview with a guest, then a panel discussion typically featuring two other guests from different sides of the political spectrum. *See id.* at ¶ 10; *see* Dkt. 150-4 at 105:21–24. *Real Time* is "probably the only show [of its kind] that consistently has on conservatives," including Robert F. Kennedy Jr., Tulsi Gabbard, Attorney General William Barr, and Kellyanne Conway. Dkt. 150-3 at 51:13–21; *see id.* at 61:20–22 ("We want both sides. I want to hear both sides. Most shows don't do

that."). In the middle of the panel discussion, Maher performs a comedic monologue about a notable current event; at the end of the discussion, he performs a scripted segment called "New Rules," with comedic takes on politics and popular culture; and the show closes with an editorial monologue about a topical issue. Dkt. 151 at ¶ 10. In Maher's words, it is a "satire show[]" in which he "make[s] jokes about people and people in the news and the news itself." Dkt. 150-3 at 197:25–198:2.

### B. Plaintiff

Plaintiff is a self-described "journalist" and "activist" who has twice mounted unsuccessful bids for a congressional seat. Dkt. 150-38; Dkt. 42 at ¶¶ 12–13, 16. Long before the Episode, she developed a reputation as one of the most controversial figures in American politics. *See, e.g.*, Dkt. 150-5 at 273:11–14, 275:13–276:6, 392:6–21; Dkt. 150-9; Dkt. 150-10.

#### 1. Plaintiff's Reputation Before The Episode

As Plaintiff acknowledges in her 2021 book *Loomered: How I Became the Most Banned Woman in the World*, her provocative behavior led her to be banned from numerous social media platforms, including Twitter (now X), *see* Dkt. 150-9; Dkt. 150-5 at 273:16–274:3; Facebook, *see* Dkt. 150-5 at 252:20–253:2; ridesharing platforms Uber and Lyft, *see* Dkt. 150-9; Dkt. 150-5 at 275:2–12; and PayPal, *see* Dkt. 150-11. Plaintiff's X account was reinstated in 2021, and she has

1.8 million followers—including, by her assessment, "most of the President's staff." Dkt. 150-5 at 20:22–23:1. Her feed is replete with controversial and offensive jokes.[1]

Well before the Episode, Plaintiff's behavior caused significant unease among Trump campaign staffers and prompted prominent conservative figures to disavow her, with one labelling her "mentally unstable and a documented liar." Dkt. 150-12. Her comments about then-presidential candidate Kamala Harris attracted particular attention. In July 2024, she tweeted that Harris has an "infested snatch" and that anything it touches "also dies a miserable, painful death." Dkt. 150-15. That same month, she posted that Harris has "sucked so much dick to get to the top throughout her 'career'" and "been ridden harder than the community bikes in San Francisco," ending the post with "Dirty harlot go away!" Dkt. 150-14.

On September 11, 2024, Plaintiff tweeted that if Harris were to win the election, the White House would "smell like curry" and "speeches will be facilitated by a call center." *See* Dkt. 150-5 at 332:10–15; Dkt. 150-44. The tweet prompted prominent Republicans such as the late Senator Lindsey Graham and then-Representative Marjorie Taylor Greene to call Plaintiff "toxic" and label her post "extremely racist." *See* Dkt. 150-5 at 342:8–12; Dkt. 150-16. Senator Thom Tillis dubbed her "a crazy conspiracy theorist who regularly utters disgusting

[1] *See, e.g.*, Dkts. 150-13, 150-41, 150-42, & 150-44.

garbage intended to divide Republicans." Dkt. 150-17. Vice President J.D. Vance said that he "do[es]n't like those comments." Dkt. 150-18. Plaintiff also has a penchant for attacking Republicans who she personally does not believe are loyal to President Trump, including publicly taunting their children and spouses. Dkt. 150-45, Dkt. 150-46, Dkt. 150-47 & Dkt. 150-62. For example, she once proclaimed that Governor Ron DeSantis' wife, a breast cancer survivor, had "over exaggerated [her breast cancer diagnosis] in a desperate effort to get votes for DeSantis." *See* Dkt. 150-49.

Plaintiff testified at her deposition that, before the Episode, she was denied a job in the White House due to concerns about her controversial opinions on the part of President Trump's inner circle. In March 2023, she had a private meeting with President Trump and his chief of staff, Susie Wiles, at which President Trump purportedly instructed Wiles to offer her a position on his campaign. *See* Dkt. 150-5 at 70:8–17. But the offer was withdrawn after it was reported in April 2023 that the President's aides "feared that hiring Ms. Loomer, who has a long history of bigoted remarks, would set off a backlash." Dkt. 150-9; Dkt. 150-5 at 78:9–20; *see also* Dkt. 153-2.

### 2. Plaintiff's Close Relationship with President Trump Before the Episode

Plaintiff and President Trump's closeness goes back well before the Episode. She testified that she has visited Mar-a-Lago at least 20-30 times for political

events and met with President Trump during 10-15 of those visits. Dkt. 150-5 at 163:17–165:22. On August 13, 2023, on her way to meet President Trump at his private box at the Trump National Golf Club, she posted "See you soon @realDonaldTrump! On my way. Can't wait to see you!!! ❤️❤️😍😍😍 #MAGA." Dkt. 150-22. At the golf club, Plaintiff publicly posted recordings of her with President Trump, who told his secretary "I love this girl," and invited Plaintiff and her friends to come to his "very private" suite. Dkt. 150-5 at 137:15–141:10. Plaintiff "gave him a hug"—and while "it's taboo to grab the president of the United States," President Trump told Secret Service, "It's fine. It's fine." *Id.* at 148:1–4. Plaintiff described the encounter with him that day as "just exhilarating." *Id.* at 147:11–149:11.

After the meeting, Plaintiff shared on social media a video of the two of them together in his private box, in which she tells him "I love you"; the post was captioned "Best president ever. I love him so much." Dkt. 150-23. In a separate post, she wrote: "He wanted me to sit next to him all day, and it was the best day ever…. I really love him with all of my heart." Dkt. 150-24. In another tweet, she posted a picture of her standing beside President Trump, looking up at him, captioned simply with the "heart-eyes" emoji: 😍 . *See* Dkt. 150-25; Dkt. 150-5 at 148:13–149:11. In December 2023, President Trump shared on Truth Social an excerpt of an interview Plaintiff gave, in which she said she had ended a romantic

relationship because President Trump was her "number-one priority," writing "Thanks, Laura!" Dkt. 150-26. On January 16, 2024, Plaintiff posted again about her love for President Trump, reposting a picture of President Trump kissing her cheek and writing "I just love him so much. ❤️ Not in a weird way. I just really love President Trump. He's the most amazing person ever. It makes me so happy every time I see him or watch his speeches." Dkt. 150-27.

When the presidential campaign entered full swing, Plaintiff was by President Trump's side. She was with him in Miami, Minnesota, Nashville, and Iowa, where it was so cold outside her hands were "freezing" and President Trump "grabbed [her] hand" to warm it up. Dkt. 150-5 at 174:9–11, 181:4–17 & 184:17–185:20. At 2:53am on July 19, 2024, after the last day of the Republican Convention, Plaintiff tweeted a video of President Trump in which he sees her in the crowd, points to her and, in response to her yelling "I love you, I love you," blows her a kiss. She goes on to yell, "You're amazing, I love you, I love you." Plaintiff posted the video, writing: "President Trump blew me a kiss from the stage. 😂🇺🇸☺️ I was in the front row on the floor of the Convention all night long cheering him on!" Dkt. 150-28.

In the week leading up to the September 13, 2024 Episode, President Trump invited Plaintiff to accompany him on his private jet five to six times, including to the presidential debate with Harris and to a 9/11 memorial event the next day. *See*

Dkt. 150-5 at 173:7–15 & 174:17–18. On the flight to New York after the debate, President Trump "invited [Loomer] to sit next to him and eat McDonald's with him." *Id.* at 210:20–211:17. Plaintiff's appearances with President Trump attracted widespread attention. *See* Dkts. 150-29, 150-30, 150-31, & 150-64; Dkt. 151 at ¶¶ 24–28, 30; Dkt. 151-20. Indeed, Plaintiff testified that there was a "media frenzy" surrounding her travel with him, which, she conceded, "is probably why Bill Maher wanted to do a segment." Dkt. 150-5 at 301:1–4; *see id.* at 428:15–16 ("[T]here was all this news coverage about me flying on the plane.").

Plaintiff's frequent presence at President Trump's side led to extensive chattering about the nature of their relationship in the days leading up to the September 13 Episode. *See* Dkt. 150-3 at 186:9–10 ("[M]e and everyone else in the media was commenting on it."). Twitter was abuzz with speculation that Plaintiff and President Trump might be in a relationship. *See* Dkt. 150-32 (September 12, 2024 Tweet with 3.919 million views stating "[t]his is why Trump is hanging out with Laura Loomer. Watch them with their hands all over each other at Mar-a-Lago. Note: He's married"); Dkt. 150-33 (September 12, 2024 tweet saying "popular theory going around is Loomer is having an affair with Trump").[2]

[2] *See also, e.g.*, Dkt. 150-34 (September 12, 2024 post on Blue Sky stating "Loomer bl***ing Trump is so funny and nasty I hope it's really happening"); Dkt. 150-35 (September 12, 2024 post with 135,6000 views stating "I'll admit I didn't have 'Trump F***ks Laura Loomer' on my 2024 election Bingo card").

Tellingly, Plaintiff herself produced 39 tweets that were published ***before the Episode***, in which posters were speculating and making jokes about her being in a sexual relationship with President Trump. *See, e.g.*, Dkt. 150-67 (Sept. 13, 2024 1:42 PM tweet: ">no wedding ring >Melania supposedly in NYC but Loomer is Trump's date to 9/11 >Trump has cheated on every woman he's ever married Yeah, I'm thinking he's a Loomer Coomer"); Dkt. 150-70 (Sept. 13, 2024 10:59 AM tweet: "So Trump is taking advice from Loomer. He's traveling with her. Taking shady pictures with her and she's STAYING AT MAR-A-Lago which Melania is not. They are banging. Love child on the way"); Dkts. 150-68 to 150-105 (tweets written prior to the September 13 Episode produced by Plaintiff).

News outlets also reported on the rumors swirling around Plaintiff's relationship with and influence over President Trump. The Miami New Times published an article on September 13, 2024 titled "Laura Loomer and Trump Sitting in a Tree, K-I-S-S-I-N-G," which noted the speculation that the two were "a romantic item." Dkt. 150-36. OK! Magazine published a similar article at 5:46 PM EST, titled "Donald Trump Accused of Having an Affair With MAGA Conspiracy Theorist Laura Loomer as Wife Melania Remains MIA." Dkt. 150-37. It reported that "[s]everal images have been circulating on X … showing Trump, 78, getting handsy with the 31-year-old MAGA supporter" and that "several critics" have been "speculat[ing] about their relationship with one another, pointing out how the ex-

president's wife, Melania Trump, hasn't been on the campaign trail since the Republican National Convention." *Id*. at 2–3.

In short, it was nearly impossible to miss the headlines that week about Plaintiff, making her obvious fodder for jokes and comment, particularly for a comedian with a weekly show offering comedic takes and opinions about the week's news cycle. *See, e.g.*, Dkt. 151 at ¶ 36 (another comedy talk show host made jokes about Plaintiff); Dkt 150-4 at 54:10–14 ("a lot of the late-night hosts were talking about her at the time").

### C. The September 13 Episode

It was in this environment that the *Real Time* team got to work on the September 13, 2024 episode of *Real Time*. As Maher testified:

> [Loomer] was at the side of the president everywhere. For me not to have commented on that, I would have been remiss in doing my job. I was hardly the only one commenting on it. It was everywhere. She seemed to be everywhere suddenly. She was blowing kisses at him or saying 'I love you. I love you. I love you,' and he was blowing kisses back at her. He had his arm around her saying 'She's softer than you think she is.' They went to the 9/11 memorial together. She was his guest. She was his guest at the debate.

Dkt. 150-3 at 18:9–21; *see id.* at 184:6–18 ("everywhere in the news that week Laura Loomer was beside the president, I love you, I love you, screaming at him; he, blowing kisses at her, putting his arm around her waist, saying she's a lot softer in person. … It was all over and I was not the only one who was making these kind of jokes or making this kind of speculation. It's in the Drudge Report. Meghan

McCain talked about it.[3] Lots of people were."); Dkt. 152 at ¶ 12.

Because of Plaintiff's prominence in the news, several *Real Time* writers drafted jokes about her (along with many other topics) for Maher's consideration in the Episode. *See* Dkt. 151 at ¶¶ 30–33, 37. The opening monologue Maher ultimately delivered on September 13 called her Trump's "new bullshit whisperer," showed a photo of the two together, noted "he's with her everywhere now," and joked about her White-House-smelling-like-curry tweet and her exchanges with Rep. Greene and Sen. Graham. *Id.* ¶¶ 32, 38; *see* Dkt. 150-1 at 8282.[4] Later in the episode, Maher spoke with comedian and former Democratic Senator Al Franken and Republican commentator Kristen Soltis Anderson as part of the panel discussion. In response to Senator Franken's observation that President Trump brought Plaintiff to a 9/11 remembrance that week, Maher made the Remark at issue. Dkt. 150-1 at 8305-06. The studio audience laughed throughout the bit.

When asked about the Remark at his deposition, Maher explained:

[3] *See* Dkt. 150-111, at 4:40–5:04 (Meghan McCain: "I think it's a fatal attraction for both of them…. The way she talks about him is insane. The way she feels about him, it's obviously a deeper love than just an adoration for a human being. The fact that he loves to be loved and this woman is there to do that, I think there is some very weird relationship going on that can be fatal for both of them.").

[4] Plaintiff was far from the sole focus of the September 13 Episode, which also included a segment relating to the Country Music Awards, with obviously made-up song titles, and discussion of other news, including the arrest of football player Tyreek Hill and a lawsuit against a California state senator for alleged sexual abuse. *See* Dkt. 150-1 at 8298–8300, 8308.

> I made a joke. I made a joke based on their sudden closeness in the news that week. I could have shown a video of them together and all the places they were together and all the things that were going on, the 'I love you' the 'I love you,' the blowing of the kisses, you're very special, all this stuff, and then just said, 'Hey, get a room.' It's just -- this is just comedy. This is -- these are jokes.

Dkt. 150-3 at 22:18–23:25. HBO's corporate representative likewise testified "he was making a joke." Dkt. 150-4 at 81:6. For Maher, "[i]t was hard *not* to make that joke," Dkt. 150-3 at 21:12 (emphasis added), and he would have been "remiss" had he not commented on "Loomer being by his side every day for a week," *id.* at 213:12–16.

Plaintiff's closeness with President Trump remained in the news in the days after the September 13 Episode. As Plaintiff herself testified, "Every single show on every news network [was] just like nonstop coverage about Laura Loomer, … Donald Trump, Laura Loomer, Donald Trump for three weeks straight." Dkt. 150-5 at 430:12–15.

**D. Plaintiff's Reputation Following the September 13 Episode**

Since the Episode, Plaintiff has remained close to President Trump, with remarkable access to, and influence over, the White House. She testified that, as of June 4, 2025, she has spoken on the telephone with President Trump, directly or indirectly through his staff, around fifty times, *see* Dkt. 150-5 at 32:8–33:15, and has texted with President Trump's staff approximately fifty times, *see id.* at 35:8–19. The day before her deposition in this case, she met with the Vice President at

the White House. *See id.* at 15:5–8. She has proudly boasted that "[m]y point of access to the White House is Donald Trump." *See* Dkt. 150-38 at 2.

Plaintiff testified that President Trump "asks me my opinions" about personnel matters in his administration, Dkt. 150-5 at 219:18–21, such as who to nominate for NASA administrator, *id.* at 217:6–21. She is reported to have been responsible for President Trump's firing of six members of his National Security Council, three leaders of the NSA, an appointee of West Point, the director of the National Vetting Center, and multiple federal prosecutors. *See* Dkt. 150-39.

To date, and consistent with her prior history, Plaintiff has not secured a job in the Administration. She testified that "there's a jealousy and an animosity, not just in the media, but also just in the culture of politics, in general, where sometimes people – maybe they're jealous of my – you know, when I saw my 'relationship' with President Trump," and that "professional jealousy" has contributed to why she "ha[s]n't been chosen for a position in the White House." Dkt. 150-5 at 99:2–101:13, 473:10–474:3. Plaintiff has likewise speculated online that the reasons she has not been granted a White House press pass are "[p]rofessional jealousy" and "pettiness." Dkt. 150-40. Plaintiff did, however, obtain press credentials from the Pentagon, boasting that her "investigative reporting has had a massive impact on the landscape of personnel decisions within the Executive Branch, our intelligence agencies and the Pentagon." Dkt. 150-109.

## II. Procedural History

After the September 13 Episode aired, Plaintiff served a retraction demand pursuant to Florida Statute § 770.01. Dkt. 150-50; *see also* Dkt. 42 at ¶ 32.

Plaintiff then filed this action in Florida state court. Defendants removed the case to federal court and subsequently moved to dismiss the action. In its decision on the motion to dismiss, the District Court did not make "findings," *contra* Appellant's Br. 3, but rather evaluated the sufficiency of the pleading. The District Court dismissed Plaintiff's claims for defamation per quod and defamation by implication but held that Plaintiff had sufficiently alleged a claim for defamation per se. Notably, the District Court declined "[a]t this pleading stage" to "consider … purported facts" such as "Ms. Loomer's own statements about her affection for Trump, repeated appearances the two made together in the days leading up to the September 13, 2024 episode, and rumors about their relationship," holding that facts beyond the complaint are "a red herring on a motion to dismiss." Dkt. 39 at 7, 9. Plaintiff filed an Amended Complaint on January 30, 2025, Dkt. 42, and the parties proceeded to discovery.

Following the close of discovery, Defendants moved for summary judgment on all claims. On April 22, 2026, the District Court granted Defendants' motion, explaining that—while on the motion to dismiss it could not consider certain facts that showed "the environment was rife with jokes and speculation about Loomer's

relationship with President Trump"—the undisputed evidence now compelled dismissal. Dkt. 194 at 3, 13, 17–18. As the District Court explained, because "no reasonable person would take the Episode as Maher commenting on facts and because Plaintiff has not proved Defendants acted with actual malice, or that she suffered damages, Defendants are entitled to summary judgment in their favor." *Id.*at 17–18.

## STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, "allegations are not evidence of the truth of what is alleged." *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012). Once the party seeking summary judgment demonstrates the absence of a genuine issue of material fact, the burden then shifts to the nonmovant, who must go beyond the pleadings and "present affirmative evidence" "showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).

## SUMMARY OF ARGUMENT

The First Amendment protects "uninhibited, robust, and wide-open" discourse about public figures, *Counterman v. Colorado,* 600 U.S. 66, 78 (2023) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964))—even when that

discourse is "not reasoned or evenhanded, but slashing" and "caustic," *Hustler Mag., Inc. v. Falwell,* 485 U.S. 46, 50, 54 (1988). Indeed, "[h]umor is an important medium of legitimate expression and central to the well-being of individuals, society, and their government." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 151 (Tex. 2004) (quoting Robert D. Sack, *Sack on Defamation* § 5.5.2.7.1 (3d ed. 2004)). However distasteful someone may find the joke, the Supreme Court has rejected the idea that the "state's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protection." *Falwell,* 485 U.S. at 50.

To prevail on her claims, Plaintiff must point to admissible evidence establishing that Defendants published a statement of fact or factual implication about her, did so with knowledge of falsity or reckless disregard for the truth, and caused her actual damage. *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). As the District Court held, Plaintiff did not do so. The evidence adduced over the course of many months of fact and expert discovery conclusively established that: (i) "a reasonable Real Time viewer would have understood Maher was making a joke, and not a statement of fact about Plaintiff and President Trump," Dkt. 194 at 13–14; (ii) "no reasonable jury could conclude based on the record evidence that Defendants acted with actual malice," *id.* at 16; and (iii)

Plaintiff did not present evidence of "her alleged damages," which "Florida law requires" of "a defamation plaintiff in a case against a media entity," *id*. Any one of those independent grounds is a basis to affirm.

## ARGUMENT

### I. The Motion To Dismiss Decision Provides No Basis For Appeal

In the Opening Brief, Plaintiff repeatedly insists that the District Court's decision denying Defendants' motion to dismiss somehow provides a basis for this Court to reverse the grant of summary judgment. *See* Appellant's Br. 3. Plaintiff is wrong. The denial of a Rule 12(b) motion is not a "final judgment." *Aldana v. Del Monte Fresh Produce N.A., Inc*., 578 F.3d 1283, 1289 (11th Cir. 2009). And, "[b]ecause the denial of a motion to dismiss is not a final judgment, statements and decisions contained therein do not become the law of the case." *State Farm Mut. Auto. Ins. Co. v. Complete Care Centers, LLC*, 2023 WL 4854724, at *2 (M.D. Fla. Jan. 11, 2023); *see also, e.g.*, *Munro v. Fairchild Tropical Botanic Garden, Inc*., 2022 WL 452257, at *6 n.4 (S.D. Fla. Jan. 13, 2022) ("any ruling at the motion-to-dismiss stage" does not dictate the "result after considering the record evidence"), *appeal dismissed,* 2023 WL 5426754 (11th Cir. Aug. 23, 2023); *Dibble v. Avrich*, 2015 WL 12532615, at *6 (S.D. Fla. July 29, 2015) (granting summary judgment in defamation case concluding a statement was not factual having not done so at the motion to dismiss stage)

More than that, while Plaintiff expresses confusion as to what changed between the motion to dismiss and the summary judgment decisions, the answer is clear: the court considered two unrebutted expert reports; deposition testimony from each of the parties; declarations detailing the format of *Real Time* and the reasons Maher believed the speculation; and well over 100 exhibits, including posts by Plaintiff herself about her close relationship with President Trump and news articles about their relationship. The motion to dismiss decision provides no help for Plaintiff here.

## II. The Remark Is Not An Actionable Statement of Fact

This Court should affirm the decision below because the District Court correctly held "based on the full context of the Episode and the series, as to which there is no dispute of material fact," the Remark cannot reasonably be interpreted as stating a fact about Plaintiff. Dkt. 194 at 13.

"A false statement of fact is the sine qua non for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983); *accord Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985). "Statements that cannot 'reasonably be interpreted as stating actual facts' about an individual" are protected." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (citation omitted).

### A. The Context Of The Remark Establishes It Was A Joke

Here, the District Court properly determined that "[t]he delivery of the Episode, by a well-known comedian, in the context of a late-night comedy television series centered around jokes, signaled to viewers that this was not a factual statement about Loomer or concerning Loomer." Dkt. 194 at 14.

In determining whether a statement is one of fact, "context is paramount." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006). The court must "'examine the statement in its totality and the context in which it was uttered or published'" and "'consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.'" *Id.* (quoting *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 57 (Fla. 1st DCA 1981)); *accord Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (courts "must consider the circumstances in which the statement was expressed"). As Plaintiff's own case noted in dismissing a defamation claim involving a statement made on television, "the average viewer would … watch[] the entire broadcast, not merely a twenty second clip." *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705–06 (Fla. 3d DCA 1999) (cited in Appellant's Br. 5).

When the context signals to listeners they will hear jokes, that context supports the conclusion that a given statement is not a statement of fact. Courts have thus dismissed defamation claims based on statements by such well-known

comedians as Jon Stewart, *see Busch v. Viacom Intern., Inc.* 477 F. Supp. 2d 764, 776 (N.D. Tex. 2007) ("[B]ecause Plaintiff's image appears in a 'fake endorsement' … on *The Daily Show*, a satiric program, no reasonable viewer would have believed that the challenged clip contained assertions of fact about Plaintiff."); Jerry Seinfeld, *see Lapine v. Seinfeld*, 31 Misc. 3d 736, 755–56 (N.Y. Sup. Ct. 2011) (statements made by "well-known comedian" on "a late-night entertainment program" that were "repeatedly punctuated by laughter from the audience" were not actionable); Ellen DeGeneres, *see Pierce v. Warner Bros. Ent., Inc.*, 237 F. Supp. 3d 1375, 1380 (M.D. Ga. 2017) (dismissing defamation claim over DeGeneres' deliberate mispronunciation of plaintiff's name to sound like "titty," because DeGeneres is "a comedian" and "no person watching the Ellen DeGeneres show could reasonably have believed anything DeGeneres said to be stating actual facts"); and Robin Williams, *see Polygram Recs., Inc. v. Super. Ct.*, 170 Cal. App. 3d 543, 556 (1985) (jokes "before an audience that knew him as a comedian" were "obvious figments of a comic imagination" and not defamatory).[5]

---

[5] Other courts around the country have likewise dismissed libel claims against comedians or provocateurs where the context makes clear the statement was not a statement of fact. *See Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1193–94 (9th Cir. 1989) (caption for a cartoon in a pornographic periodical was not actionable); *Riley v. Moyed*, 529 A.2d 248, 252 (Del. 1987) (statements by "well-known professional provocateur who relie[d] on heavy sarcasm to create controversy or convey a message" were not actionable); *Myers v. Bos. Mag. Co.*, 380 Mass. 336, 342 (1980) (context of the statements at issue "suggest[s] that the expressed opinions will have an especially humorous inclination and fanciful tone"

Importantly, courts have also recognized that satire "is often grounded in truth" and "layer[s] fiction upon fact," just as Maher's joke about a possible romantic relationship between Plaintiff and President Trump was "layer[ed]" upon the real-world facts of their frequent appearances together. *Farah v. Esquire Mag.*, 736 F.3d 528, 537 (D.C. Cir. 2013). In *Farah*, the court held that, considering a blog post "in its context, the reasonable reader could not understand [it] to be conveying 'real news'"—even though "apart from its headline, the article did not employ the sort of imitation and exaggerated mimicry that are typical of parody"—because the "primary intended audience … would have been familiar with *Esquire*'s history of publishing satirical stories, with recent topics ranging from Osama Bin Laden's television-watching habits to 'Sex Tips from Donald Rumsfeld,'" and thus would have understood the blog post to be "an ironic joke." *Id.* at 536–39.

Here, a reasonable viewer of *Real Time* would have understood Maher to be making a joke.[6] *See* Dkt. 150-51 at 5–9; Dkt. 150-52 at 16–31.[7] Not only did

---

and is not "conducive to misunderstanding a joke as a statement of fact"); *New Times*, 146 S.W.3d at 161 ("a reasonable reader could only conclude that the article was satirical" and not "stating actual facts" based on "the obvious clues in the article itself," the publication's "intentionally irreverent tone" and "semi-regular publication of satire," and "the satire's timing and commentary on a then-existing controversy").

[6] Plaintiff cites *Almanzar v. Kebe* in arguing that Maher made an actionable statement of fact, Appellant's Br. 11, but the defendant in *Almanzar*—a "news blogger"—never argued the statements at issue, including that the plaintiff was a

Maher, *Real Time* executive producer Dean Johnsen, and HBO executive Nina Rosenstein repeatedly testify that Maher was making a joke, *e.g.*, Dkt. 150-3 at 21:12, 22:18–23:25, 57:9–11; Dkt. 150-4 at 81:5–6; Dkt. 151 at ¶¶ 40-41, but viewers know comedians on late-night shows "make jokes" about the headlines of the week and "don't do investigations" or break news, Dkt. 150-3 at 185:14–15. As Professor Jody Baumgartner, an expert on political humor and editor of the encyclopedia *American Political Humor*, testified in his unrebutted report:

> [E]verything about the context of *Real Time with Bill Maher*, from Maher's long history and renown as a self-identified comedian, to the expectation that studio audience members will laugh and applaud, to the set itself, which resembles the sets of so many other late-night shows, signals to the audience that the content of the show consists of jokes and other comedic material, not the earnest product of investigative journalism…. Maher's program corresponds to what viewers expect of late-night talk-comedy programming and distinguishes it from more informative, news-based programming…. [A]udience members and television viewers know that the sender or source of the messages they are receiving from *Real Time* is a comic.

Dkt. 150-51 at 1–2, 9.

As Baumgartner describes, while *Real Time* includes discussion of news events (as do all "late night" shows), numerous contextual elements signal to

---

prostitute and had herpes, were jokes, opinions, or rhetorical hyperbole. 2021 WL 5027798, at *1–3 (N.D. Ga. July 8, 2021).

[7] Defendants are not arguing—and the District Court did not hold—that there is "blanket 'immunity' for 'comedians' against defamation." Appellant's Br. 10–11. Rather, as Plaintiff herself repeatedly concedes, the "question to be determined is [how] the communication is reasonably understood," *id*. at 7; *see id.* at 8, 10—and that the speaker is a comedian is one notable part of how the audience understood the communication.

viewers that they are likely to hear jokes, not purely factual news reports. *Id.* at 9. Maher used vulgar language that would never be permitted on a broadcast news program. *See id.* at 9. He made the joke before a live studio audience, in a show that airs during a late-night slot on entertainment network HBO. *Id.* The panel discussion in the September 13 Episode was punctuated with laughter and applause throughout, including immediately after the Remark was made. *See* Dkt. 150-1 at 8306. The delivery of the Remark was in the format of a joke, with a set-up (Plaintiff's comment about Taylor Swift's relationship) leading to the punchline. Dkt. 150-51 at 9. In short, as Professor Baumgartner demonstrated, the context signaled to viewers that this was not a factual statement.

Moreover, as Professor Clay Calvert pointed out in his own expert report, the timing of the Remark—"while Trump was running as the Republican nominee for President of the United States in the fall of 2024"—places the joke at the very core of the First Amendment's protection for unfettered discussions of candidates for office. Dkt. 150-52 at 34.

In the face of the abundant evidence that Maher was making a joke, Plaintiff makes two unsuccessful arguments. First, she cites only her own affidavit stating that "Maher is not a comedian" and a screengrab of the show purportedly showing that the panelists did not laugh. Appellant's Br. 10–13. But Plaintiff is of course not an expert in comedy, and that "self-serving, conclusory" assertion, unsupported

by any expertise or "personal knowledge beyond mere speculation or belief," has no evidentiary weight. *Smith v. Young*, 2013 WL 1729000, at *12 (N.D. Fla. Mar. 6, 2013), *R & R adopted,* 2013 WL 1729096 (N.D. Fla. Apr. 22, 2013); *see* Fed. R. Civ. P. 56(c)(4). Moreover, as Professor Baumgartner explained and the District Court recognized, a joke is a joke if it is "*intended* to make people laugh," "whether it is found to be either funny or 'groan-worthy.'" Dkt. 151 at 14; *see also* Dkt. 194 at 14; *Polygram Records, Inc.*, 170 Cal. App. 3d at 556–57.

Next, Plaintiff—who did not depose or seek to *Daubert* Defendants' experts—argues this Court should disregard both experts because they "just state … that [Defendants] should not be liable for defamation." Appellant's Br. 12. Plaintiff is wrong. Not only does Plaintiff's objection to Defendants' expert reports amount to "an untimely *Daubert* challenge," *Stevenson v. Cyprus Amaz Minerals Co*., 2018 WL 8608281, at *3 (M.D. Fla. June 29, 2018), but the reports satisfy *Plaintiff's own account* of what experts must offer: Professor Calvert's report is replete with "supporting analogous case law," and Professor Baumgartner's report provides ample "analysis about the actual facts and circumstances at issue in this case," as when he describes the format, set, and language of *Real Time* and situates them within the context of political comedy and the tropes of late-night television. Appellant's Br. 12.

The "record evidence" thus confirms, as the District Court recognized, "that Maher, a well-known comedian, was making a joke based on the media frenzy surrounding Loomer and President Trump." Dkt. 194 at 12.

### B. Maher Was Offering Opinion, Not Making A Statement Of Fact

The District Court order can also be affirmed because the Remark is constitutionally protected opinion. Statements of opinion "are protected from defamation actions by the First Amendment," *Turner*, 879 F.3d at 1262, as are statements "readily understood as conjecture, hypothesis, or speculation." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997); *see also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.") (citations omitted); *Marshall v. Planz*, 13 F. Supp. 2d 1246, 1257–59 (M.D. Ala. 1998) ("speculation or conjecture … presents or implies no truly objectively verifiable facts that would infuse it with defamatory content").

Maher made clear he was speculating when he said "*I think maybe* Laura Loomer is in an arranged relationship" with President Trump, "we *may* have our answer" to the question of "who's Trump f***ing?," and "I *think*" the answer "*might* be Laura Loomer." Dkt. 150-1 at 8305–06. Because that Remark plainly expresses "a subjective view, an interpretation, a theory, conjecture or surmise,

rather than a claim to be in possession of objectively verifiable false facts, the statement is not actionable." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (quotation omitted). Plaintiff's arguments to the contrary all fail.

First, citing *StopLoss Specialists, LLC v. Vericlaim, Inc.*, 340 F. Supp. 3d 1334 (N.D. Ga. 2018) and *Dougherty v. Harvey*, 317 F. Supp. 3d 1287 (N.D. Ga. 2018), Plaintiff argues that phrases like "may or may not be" do not automatically make a statement one of opinion. Appellant's Br. 13–15. But the context of the statements at issue in those cases was a far cry from the Remark at issue here. For example, in *StopLoss Specialists*, a 28-year veteran insurance claims adjuster sent an email citing "documentation" that Stop Loss was "dumping water into dried buildings," concluded that it "appear[ed] to be insurance fraud," and noted that an "investigation has been initiated." 340 F. Supp. 3d at 1339, 1342, 1351. The context thus signaled to the reader that the claims adjuster was making a factual statement about fraudulent activity. Likewise, the statement at issue in *Dougherty* was made during the keynote speech at an insurance industry conference, by a former employee of the man he said he could neither "confirm nor deny" was HIV-positive. 317 F. Supp. 3d at 1289. On these facts, the court concluded that a reasonable listener could take that "out-of-place insertion" of the "HIV statement" to mean that the man was "HIV positive." *Id.* at 1292. Both scenarios are a far cry from a comedian offering bawdy conjecture about the President, based on the

disclosed facts about Plaintiff's age, apparent closeness to Trump, and that she "looks like his 'type.'"

Next, Plaintiff argues that the Remark is actionable "mixed opinion." Appellant's Br. 18–20. Not so. "Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984). By contrast, "[c]ommentary or opinion based on facts that are set forth in the [broadcast] or which are otherwise known or available to the [viewer]" are protected as pure opinion. *Rasmussen v. Collier Cnty. Publ'g Co.*, 946 So.2d 567, 571 (Fla. 2d DCA 2006); *accord Turner v. Wells*, 198 F. Supp. 3d 1355, 1366 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1355.

Here, the Remark was based on facts disclosed to the audience. In his opening monologue, he introduced Loomer, explaining that President Trump is "with her everywhere now." Dkt. 150-1 at 8282. Then, right before the joke at issue, Senator Franken remarked that Loomer had been travelling with him. *See id.* at 8282, 8304–06. Before offering his joking speculation, Maher set it up by giving the audience the bases for the speculation: Loomer's closeness with President Trump, President Trump's history of adultery ("he's been a dog for too long"), and

Melania's absence from the campaign trail ("it's not Melania"). *Id.* at 8305. Based on that, Maher said he "think[s]" "he knows" who Trump is "f***ing." *Id.* The show itself thus provided the facts on which Maher's opinion is based.

Even if Maher had not recited the factual premises for his speculation, they were well known to the viewing public. Under Florida law, "for an opinion to be pure and non-actionable, it need not necessarily be based upon facts that the communicator sets forth explicitly in the publication"; "facts 'otherwise known or available to the reader or the listener as a member of the public' will suffice." *Tillett v. BJ's Wholesale Club, Inc.*, 2010 WL 11507322, at *6 n.12 (M.D. Fla. July 30, 2010) (citation omitted).[8] President Trump is widely reported to have had affairs in the historical past. *See* Dkt. 150-3 at 66:2–4, 66:12–16 & 187:9–14. And, in the days before the Episode, as Plaintiff testified, there was a "media frenzy" surrounding her appearances on President Trump's campaign plane and at his side. *See* Dkt. 150-5 at 301:1–4. Countless news outlets reported on those appearances. *See, e.g.*, Dkts. 150-30, 150-31 & 150-65. Pictures of them together were everywhere, in the news, *e.g.*, Dkt. 150-107, and on social media, *e.g.*, Dkts. 150-32 & 150-67.

---

[8] *See also, e.g.*, *Rasmussen*, 946 So. 2d at 571 (editorials were opinion because they were "based on facts disclosed in the articles themselves or in the extensive coverage" of the "controversy"); *Hay*, 450 So. 2d at 295 (calling plaintiff a "crook" was opinion based on facts "readily available to the reader as a member of the public").

This case is therefore unlike the cases cited by Plaintiff. Unlike in *Barnes v. Horan*, 841 So. 2d 472 (Fla. 3d DCA 2002) (cited in Appellant's Br. 5), Maher never suggested to his audience that he had spoken to sources close to Plaintiff or President Trump or otherwise was privy to inside information. In *Barnes*, the defendant implied he "had knowledge of undisclosed facts" by referring to, among other things, his "longer personal and professional relationship with [the plaintiff] than any other Monroe County citizen," and to his "*informed* opinion." *Id.* at 478. Maher made no comparable statements. This case is also unlike *Gottwald v. Bellamy*, 2011 WL 2446856, at *4 (M.D. Fla. June 15, 2011) (cited in Appellant's Br. 19–20), in which the court held that the plaintiff had alleged actual malice because the defendants had concealed known facts. Here, Defendants are not alleged to have omitted any known facts that would controvert the opinion.

Because Maher's speculation or conjecture was based on facts set forth in the Episode itself or otherwise "known or available" to the viewer, the Remark is pure opinion not actionable as a matter of law.

### C. The Remark Is Rhetorical Hyperbole

Finally, the Remark is "rhetorical hyperbole," which is also protected under the First Amendment. As the Supreme Court remarked in *Falwell*, "despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have

played a prominent role in public and political debate," and "our political discourse would have been considerably poorer without them." 485 U.S. at 54–55. So too with verbal rather than graphic mockery: the First Amendment protects "loose, figurative, or hyperbolic language which would negate the impression that the" speaker is making an assertion of fact. *Milkovich*, 497 U.S. at 21.

The Remark is a paradigmatic example of such language. It contains slang, crass language, and obscenity—three hallmarks of rhetorical hyperbole. *See, e.g.*, *Fortson*, 434 F. Supp. 2d at 1382 ("slang phrase" "thugged out" was rhetorical hyperbole); *Scott v. Moon*, 2019 WL 332415, at *3 (W.D. Va. Jan. 24, 2019) (insults like "f***ing stupid" and "slut whore" were rhetorical hyperbole), *aff'd*, 773 F. App'x 138 (4th Cir. 2019); *Graham v. UMG Recordings, Inc.*, 2025 WL 2879607, at *9-10 (S.D.N.Y. Oct. 9, 2025) ("profanity," "trash-talking," and "vitriolic words and imagery" are "indicia" of rhetorical hyperbole). Maher curses (e.g., "who's Trump f***ing?") and describes Trump as "a dog". No reasonable viewer would understand that Maher to be earnestly saying Trump *was* a dog or reporting facts about who Trump was sleeping with; a reasonable reader would understand him to be employing rhetorical hyperbole, as the law permits.

* * *

For all these reasons, as the District Court held, "no reasonable person would take the Episode as Maher commenting on facts." Dkt. 194 at 17. Finding

Maher liable for defamation per se or per quod based on the Remark "would run afoul of the First Amendment and chill the free speech rights of all comedy performers and humorists, to the genuine detriment of our society." *Polygram Recs*., 170 Cal. App. 3d at 557. The grant of summary judgment should be affirmed.

## III. The Defamation-By-Implication Claim Also Fails

A "defamation by implication applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Rapp*, 997 So.2d at 1108. Plaintiff's defamation-by-implication claim must be dismissed for three reasons.

*First*, Plaintiff's defamation claim is not based on "impression[s]." *Id.*at 1108. On the contrary, Plaintiff alleges the Remark actually states she is having an affair with the President, not that it is silently implied. Dkt. 42 at ¶ 19. That is not a claim for defamation by implication.

*Second*, insofar as Plaintiff contends the implication is that she was "engaged in sexual relations with Donald Trump," Dkt. 42 ¶¶ 58, 61, that implication is fundamentally the same as the Remark over which Plaintiff asserts defamation per se and per quod claims and similarly fails because the implication is not a statement of fact. *See Markle v. Markle*, 2024 WL 1075339, at *26 (M.D. Fla. Mar. 12, 2024) (dismissing defamation-by-implication claim based on same

defenses as "non-actionable" defamation claims), *appeal filed* (24-11091) (11th Cir. Apr. 9, 2024); *Rapp*, 997 So.2d at 1108 (opinion is defense to defamation-by-implication claim).

*Third*, claims for defamation by implication cannot be based on allegedly false statements. *See, e.g.*, *Jacoby v. CNN,* 537 F. Supp. 3d 1303, 1313 (M.D. Fla. 2021) ("The Court cannot accept as true Plaintiff's allegation in Count I that this statement is false, while also accepting as true Plaintiff's allegation in Count II that this same statement is true."), *aff'd*, 2021 WL 5858569 (11th Cir. Dec. 10, 2021); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1124 (S.D. Fla. 2021) ("The Complaint pleads only that [defendant's] accusations were false—not that they were true and gave a false implication—which requires dismissal."); *Flynn v. Cable News Network, Inc.*, 2023 WL 5985193, at *7 (M.D. Fla. Feb. 22, 2023) (dismissing claim where "the allegedly false statement of fact underlying her defamation per se claim and the false implication underlying her defamation by implication claim are one and the same"). And here, Plaintiff repeatedly alleges that the punchline of the Remark is "false." Dkt. 42 at ¶¶ 18, 57–60, 62, 85, 87–90, 92). That dooms her claim.

Plaintiff tries to avoid that result by alleging that Defendants made "five separate statements" "to create the defamatory implication that Ms. Loomer had committed adultery with President Trump": "(1) Ms. Loomer is 'very close to

Trump,'[true], (2) Ms. Loomer is 31 years old [true], (3) Ms. Loomer 'looks like [Trump's] type,' [could be true, but unknown to Ms. Loomer], (4) Trump is a 'dog' who has to be sleeping with someone [veracity unknown to Ms. Loomer], and (5) the person that Trump is sleeping with is not his wife, Melania [veracity unknown to Ms. Loomer]." *Id.* ¶ 24. But Plaintiff does not allege that three of those statements—that she "looks like his type," that President Trump is a "dog," and that President Trump is not sleeping with Melania, *id.* ¶¶ 18, 24—are literally true. And the only two statements Plaintiff alleges are "literally true"—that Plaintiff was 31 years old and "very close to Trump"—are not alleged on their own to convey the implication that is sleeping with President Trump. [9] Indeed, if those two facts alone gave rise to a defamatory implication, every news article discussing Plaintiff at the time of the Episode would be defamatory.

For all of these reasons, Plaintiff cannot show defamation by implication.

---

[9] Plaintiff argues that this case is analogous to *Block v. Matesic*, 2023 WL 3816693 (S.D. Fla. June 5, 2023). *See* Appellant's Br. 17. But in *Block*, the three literally true statements, taken together, "implied that the plaintiff had obtained their emails by some wrongful means and that it had caused security concerns." 2023 WL 3816693, at *4, while here, the only literally true statements carry no such defamatory implication. Moreover, Plaintiff ignores that the plaintiff's claims in *Block* were dismissed on summary judgment for failure to prove actual malice. *Block v. Matesic,* 789 F. Supp. 3d 1131, 1181 (S.D. Fla. 2025), *appeal dismissed*, 2026 WL 810430 (11th Cir. Mar. 24, 2026).

## IV. Plaintiff Cannot Show Defendants Acted With Actual Malice

As the District Court recognized, even if "the Episode concerned false facts about Loomer, the claims still fail as a matter of law" because she cannot prove actual malice. Dkt. 194 at 14. On summary judgment, "public figure plaintiffs like Loomer," *id.*, must show that a jury could find, by clear and convincing evidence, that Defendants acted with actual malice. *See Anderson*, 477 U.S. at 255–56; *Dershowitz v. Cable News Network, Inc.*, 153 F.4th 1189, 1193 (11th Cir. 2025).[10] "Actual malice" is a purely "subjective test" that turns on whether a defamation defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Turner*, 879 F.3d at 1273; *Sullivan*, 376 U.S. at 280. *Id.* "The actual malice standard was designed," as the District Court observed, "to allow publishers the 'breathing space' needed to ensure robust reporting on public figures and events." Dkt. 194 at 15 (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)). There is no "genuine factual issue as to actual malice" "if the evidence presented in the opposing affidavits is of

[10] Plaintiff contends that actual malice is "presumed." Appellant's Br. 30. She is wrong. First, Plaintiff's cited case, *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. 4th DCA 1973), involved a private figure, and thus the court did not perform any actual malice analysis. Any "public figure is required to prove actual malice by clear and convincing evidence." *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999). Second, since *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), actual malice is no longer presumed in "libel action[s] against the media." *Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985); *accord Corsi*, 519 F. Supp. 3d at 1119; *Reed v. Chamblee*, 2023 WL 6292578, at *23 n.22 (M.D. Fla. Sept. 27, 2023), *aff'd*, 2025 WL 1874638 (11th Cir. July 8, 2025).

insufficient caliber or quality to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254.

Here, as the District Court held, "the record is bereft of any evidence" of actual malice. Dkt. 194 at 14. At her deposition, Plaintiff herself testified that Maher believed the Remark to be true. When asked under oath to "[n]ame a single human being on Planet Earth who you know of that believes what Bill Maher allegedly said," her only response was "Bill Maher." Dkt. 150-5 at 235:22–257:13. She even doubled down, insisting "you said name one person, and I said, 'Bill Maher.'" *Id.* at 235:22–257:13. That admission alone entitles Defendants to summary judgment on actual malice.[11]

Maher's own sworn testimony also refutes actual malice. He testified that, to the extent his statement that President Trump "may" be sleeping with Plaintiff can be construed as a statement of fact, he had no reason to doubt it—in light of President Trump's reported prior affairs, the reported closeness between him and the young, attractive Loomer, and Plaintiff's own commentary about President

[11] To show actual malice in defamation-by-implication cases, the plaintiff must show "not only (1) that the defendant knew of or recklessly disregarded the falsity of the implied defamatory statement, but also (2) that the defendant 'inten[ded] to communicate the defamatory meaning' or recklessly disregarded the defamatory meaning." *Moore v. Cecil*, 174 F.4th 862, 882-83 (11th Cir. 2026), *pet. for cert. filed sub nom.*, *Moore v. Senate Majority PAC* (26-122) (U.S. July 28, 2026). Maher intended to tell a joke, Dkt. 150-3 at 21:12, 22:18–23:25, 57:9–11, not to convey a factual assertion that Plaintiff was sleeping with President Trump.

Trump, he thought it was possible that they might actually be sleeping together. Dkt. 152 at ¶ 16; Dkt. 151 at ¶ 41. Maher did not doubt the Remark.

In response, Plaintiff argues that Maher testified he had no information she had sex with President Trump. But his full answer was "No, that's why it's a joke." Dkt. 150-3 at 23:7–9. Far from acknowledging that he doubted the truth of the Remark, the actual testimony makes clear he did not intend it to be a statement of fact. In any event, the "failure to investigate … does not indicate the presence of actual malice." *Michel*, 816 F.3d at 703; *see also, e.g.*, *Klayman v. City Pages*, 650 F. App'x 744, 750–51 (11th Cir. 2016) ("[f]ailure to investigate and poor journalistic standards are insufficient to establish actual malice") (citation omitted). And that is particularly so when "the circumstances" do not call for an investigation—unlike a newspaper report on a CIA plot by a writer who the publisher "absolutely" had reason "to question." *Hunt v. Liberty Lobby*, 720 F.2d 631, 644–45 (11th Cir. 1983) (cited in Appellant's Br. 25–26). Where, as here, a statement is made on a television program "for entertainment purposes," *Lovingood v. Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301, 1313 (N.D. Ala. 2017), *aff'd*, 800 F. App'x 840 (11th Cir. 2020), the failure to investigate prior to publication does not support actual malice.

In addition, as the District Court recognized, Maher's Remark was not "inherently improbable, or obviously worthy of doubt." Dkt. 194 at 15 (quoting

*Readon v. WPLG, LLC*, 317 So.3d 1229, 1236 (Fla. 3rd DCA 2021)). President "Trump's history of infidelity" is no secret. *See* Dkt. 150-3 at 66:2–4. And when "this very attractive young woman," appeared "at the side of the president everywhere," "blowing kisses at him or saying 'I love you. I love you. I love you*,"* *id*. at 18:9–21; Dkt. 150-5 at 153:18–19, it caused many to wonder if the two were romantically involved.

Maher and the *Real Time* writers were also well-aware of the reporting about Plaintiff's closeness with President Trump in the week leading up to the September 13 Episode. *See* Dkt. 151 at ¶¶ 24–27. In preparing for the Episode, the *Real Time* writers all received, as research materials, articles from the week of September 9, 2024 reporting on Plaintiff's appearances and relationship with President Trump. *See* Dkt. 151 at ¶¶ 25–26, 35 & Dkts. 151-1, 151-2, 151-3, 151-7, 151-8, 151-9, 151-22. One, for example, discussed "Laura Loomer's increasing presence in former President Trump's inner circle," the "significant time" they have spent together, and concerns raised by other Republicans about her "access to Trump"; referencing "the Trump-Loomer admiration fest," it noted that Trump has "given her shout-outs while on stage at his rallies, and sent her handwritten notes." Dkt. 151-21. *Real Time* also reviewed Plaintiff's posts on X, where they saw photos of her and Trump together, captioned with hearts, heart-eyes emojis, and statements like "I really love him with all of my heart." *See* Dkt. 151-17. In the context of

such prior reports and evidence, the Remark—to the extent it can even be construed as a statement of fact or a defamatory implication—was not improbable.

Plaintiff tries to sidestep this abundant record by arguing the prior publications were not by "reputable sources" but rather "random individuals without direct knowledge." Appellant's Br. 24. But Defendants, through the Johnsen Declaration that Plaintiff ignores and otherwise, cited a panoply of well-regarded news sources reporting on Loomer's closeness with Trump, as well as Plaintiff's own posts on X—all now properly before the Court on summary judgment. *See, e.g.*, Dkts. 151-29, 150-30, 150-31, 150-64, 150-107, 151-20. It was Plaintiff herself who produced many of the posts by "random individuals."

Plaintiff's remaining arguments as to actual malice are equally unavailing.[12] She invokes Defendants' "refusal" to seek comment from her, to issue a retraction, or to invite her to appear on a future episode of *Real Time*. Appellant's Br. 27–28. But, as the District Court recognized, Dkt. 194 at 15–16, neither the "failure to print [plaintiff's] denials," *Dockery v. Fla. Democratic Party*, 799 So. 2d 291, 296 (Fla. 2d DCA 2001), nor "the failure to retract or correct a falsehood," *Hunt*, 720 F.2d at 643 n.19 (citation omitted), proves actual malice.

Likewise, that the show underwent legal review, Appellant's Br. 23–24, in

[12] Plaintiff's arguments are derived from a 2018 Florida Bar Journal article discussing 24 "badges" of malice. Appellant's Br. 26–28. No court has ever cited that article or adopted its "badges of malice" theory.

no way shows Defendants knowingly made a false statement of fact. *See, e.g.*, *HBO v. Huckabee*, 995 S.W.2d 152, 160–61 (Tex. App. 1998) (rejecting argument that actual malice could be inferred by defendant's legal review of documentary). To the contrary, legal review "undermine[s]" rather than proves "the presence of actual malice." *Grayson v. No Labels, Inc.*, 2022 WL 1701853, at *5–6 (M.D. Fla. May 20, 2022).

Next, the unrebutted evidence disproves Plaintiff's claim that Defendants sought "clicks, fame, and notoriety." Appellant's Br. 27, 37. Maher testified: "You're assuming I do my show for clicks. I don't. In fact, I had a billboard up twice and the catch phrase on it was 'He's not in it for the likes.' … And that's my bond with the audience. I don't do it to pander to them. I don't do it for the clicks." Dkt. 150-3 at 63:20–64:3. And, in any event, "the fact that [a] defendant published [] defamatory material in order to increase its profits" does not "prove actual malice." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).

Finally, Plaintiff's argument about Defendants' supposed "ill will" toward the Plaintiff is similarly both unsupported and irrelevant. Appellant's Br. 28. Maher testified that he did not "hate" Loomer. *See* Dkt. 150-3 at 119:14–15 (Maher: "I do not hate anyone"). He made jokes about her on September 13 and again on September 20, 2024 because, by her own admission, she was "nonstop" in the news at that time. Dkt. 150-5 at 430:12–15. Regardless, "[i]ll will is different

than actual malice." *Klayman v. City Pages*, 2015 WL 1546173, at *13 (M.D. Fla. Apr. 3, 2015) (citations omitted), *aff'd*, 650 F. App'x 744. That is true in the Eleventh Circuit—as Plaintiff concedes when she urges the Court to "reconsider its position," Appellant's Br. 28—and everywhere else. As the Supreme Court has explained, "[t]he phrase 'actual malice' is unfortunately confusing in that it has *nothing to do with bad motive or ill will*." *Harte-Hanks*, 491 U.S. at 666 n.7 (emphasis added). And, because actual malice turns on whether statements were thought "to be false *at the time they were made,*" *Dockery*, 799 So. 2d at 294 (emphases added) (citation omitted), what Defendants "did or did not say days later," in the September 20 episode, "does not inform the analysis," as the District Court held. Dkt. 194 at 16. Plaintiff cannot meet her heavy burden of offering clear and convincing evidence that proves actual malice.

## V. Plaintiff Cannot Meet Her Burden to Show Damage

Plaintiff's defamation claims also "fail as a matter of law for the separate reason that Plaintiff does not establish a genuine issue of fact as to her alleged damages," as the District Court correctly held. Dkt. 194 at 16.

As the District Court recognized, "Florida law requires a defamation plaintiff in a case against a media entity to prove damages," Dkt. 194 at 16, including in cases of defamation per se, *see, e.g.*, *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001); *Mid-Fla. Television Corp.*, 467 So. 2d at 283;

*Corsi*, 519 F. Supp. 3d at 1119; *Shriteh v. NYP Holdings, Inc.*, 2026 WL 386705, at *4 n.5 (M.D. Fla. Feb. 11, 2026), and defamation by implication, *see generally Rapp*, 997 So.2d at 1108.

In her brief, Plaintiff challenges the District Court's finding that Defendants were media defendants. Appellant's Br. 31. But Plaintiff did not dispute that Maher and HBO are media defendants at summary judgment and has therefore forfeited the argument on appeal. *See Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001).[13]

And, in any event, even if this Court were to consider Plaintiff's belated argument, it should reject it. Defendants are quintessential media defendants. *See* Dkt. 194 at 16–17; *see also, e.g.*, *Nichols v. Moore,* 477 F.3d 396, 400 (6th Cir. 2007) (filmmaker was "media defendant" for purposes of constitutional limitations imposed by First Amendment on defamation claims); *Street v. Nat'l Broad. Co.,* 512 F. Supp. 398, 406 n.6 (E.D. Tenn. 1977) (applying Gertz's actual damages requirement to acquirer and distributor of television docudrama and noting that "[t]elevision entertainment … is under the blanket of First Amendment protection") (citation omitted), *aff'd*, 645 F.2d 1227 (6th Cir. 1981). That Maher is

[13] Plaintiff is trying to have it both ways: the Florida Law Journal article Plaintiff relies upon here repeatedly refers to what "media defendants" do. Dkt. 173, Ex. 2. Plaintiff's Declaration, in which she stated that Maher is a "political pundit" and not a comedian, also contradicts her current position. Dkt. 173-1 at ¶ 9**.**

a comedian does not take him outside the scope of media defendants. *Contra* Appellee Br. 31. To the contrary, as the Supreme Court has long recognized, news and entertainment are equally parts of the "media" ecosystem. *See Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967) ("[T]he line between the informing and the entertaining is too elusive for the protection of freedom of the press.") (citation modified); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501 (1952) ("What is one man's amusement, teaches another's doctrine.") (citation omitted); *Brown v. Ent. Merch. Ass'n.*, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try."); Dkt. 150-52 at 16–31. That is particularly the case when it comes to politically oriented late-night shows like *Real Time*, for which the headlines of the week are fodder.

To avoid this, Plaintiff cites *Mazur v. Baraya*, 275 So. 3d 812, 816 (Fla. 2d DCA 2019), to argue that "Florida courts use the terms 'media defendant' and 'non-media defendant' to 'separate third parties who are not engaged in the dissemination of news and information through the news and broadcast media from those who are so engaged.'" Appellant's Br. 36. But Florida courts have interpreted what it means to be engaged in the dissemination of news and information broadly. In particular, Florida courts interpreting Section 770.01,

which requires plaintiffs to give notice to media defendants before filing a defamation suit, have explained that "media defendants are not just those who 'impartially disseminate information,' or 'issue unsolicited disinterested and neutral commentary as to matters of public interest.' The term also applies to those who 'editorialize as to matters of public interest without being commissioned to do so by [their] clients.'" *Tobinick v. Novella*, 2015 WL 1191267, at *8 (S.D. Fla. Mar. 16, 2015) (citations omitted); *see also, e.g.*, *Grlpwr, LLC v. Rodiguez*, 2023 WL 5666203, at *1 (N.D. Fla. Aug. 25, 2023) (operator of a YouTube channel about pyramid schemes was media defendant for purposes of Section 770.01). That is precisely what *Real Time* does each week—editorialize as to matters of public interest. *See, e.g.*, Dkt. 150-3 at 37:3–4 ("It's part of my job to render my opinion on the passing parade of American politics."); Dkt. 150-4 at 41:13 ("It's an opinion show."). Indeed, Plaintiff acknowledged that Defendants are media defendants by making a retraction request under Section 770.01. *See* Dkt. 32 at ¶ 32; *Zelinka v. Am. Healthscan, Inc.*, 763 So. 2d 1173, 1175 (Fla. 4th DCA 2000).

Plaintiff is thus required to prove that she was damaged, and that the Episode was the proximate cause of that injury. *See, e.g.*, *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006); *Egwuatu v. Burlington Coat Factory Warehouse Corp.*, 2011 WL 2413833, at *5 (M.D. Fla. June 10, 2011); *Wound Care Concepts, Inc. v. Vohra Health Servs. P.A.*, 2022 WL 320952,

at *14 (S.D. Fla. Jan. 28, 2022). She has failed to do so. As the District Court correctly found, she "has not identified a single individual who believed that she was sleeping with President Trump because of the Episode or a single relationship that was damaged as a result of the Episode."[14] Dkt. 194 at 17. "She has not offered any expert testimony quantifying her reputational harm." *Id.* "She has not introduced income statements or tax records from the year of the Episode or after to prove a decline in her income." *Id.* In fact, she "testified that her income increased in 2024 compared to prior years and that she continues to speak to and meet with President Trump," to be solicited for her opinions by him, and to receive invitations to the White House. *Id.*; *see* Dkt. 150-5 at 15:2–4, 32:8–34:8, 216:21–217:21, 219:18–21, 485:9–14.

Plaintiff's theory of damages hinges on her unsupported allegations that she was denied a job in President Trump's administration because of the Remark and that she would have been able to "parlay … working for a presidential

[14] On appeal, Plaintiff argues that this is a "red herring" because her alleged damage came from "the public perception of her and President Trump's relationship" caused by the Remark. Appellant's Br. 34. But Plaintiff offered no evidence that the Remark caused any such public perception, and her own inability to name a single individual who believed Maher belies that conclusion.

administration into getting other jobs in the future." Dkt. 150-5 at 244:20–245:18.[15] That theory lacks any support in law or fact.

*First*, damages have to arise from the mistaken belief that the allegedly false statement of fact is true. *See Sullivan*, 376 U.S. at 260 (no proof of damages absent evidence that third parties "actually believed the statements"). Plaintiff cites no evidence that President Trump or his staff believed the statements to be true. To the contrary, she testified that "nobody I know actually believe[d] [it]…. They know that … there was no romantic relationship," Dkt. 150-5 at 233:7–14, and that "most of the president's staff follow me on social media," *id.* at 20:22–21:1.

*Second*, even if anyone believed the statement to be true, the notion that she would have gotten a job in the Trump administration and then as a television news anchor but for the Episode is "entirely speculative," as the District Court held, Dkt. 194 at 17, and as Plaintiff herself conceded, *see* Dkt. 150-5 at 246:11–14 ("So when you work for an administration, once the person is out of office, or once you're done with your job, you know, that could parlay into a lot of speculative opportunities."); *see id.* at 245:7–9 ("[I]t makes me wonder how much it's going to cost me both in my reputation and also … in monetary value."); *id.* at 245:17–19

[15] Plaintiff testified that she would make $180,000 if she had a job in the White House. *See* Dkt. 150-5 at 243:21–244:2 & 484:8–22. Even assuming that she will not get that job and that she will make less than $180,000 in 2024-2028, any difference between her actual earnings and $180,000 over four years is obviously untethered to her claimed $150 million in damages.

("[W]ho knows what I could have parlayed having that on my resume."); Dkt. 150-55.[16]

Moreover, Plaintiff's own well-documented history of controversial behavior makes it impossible to prove Defendants' Remark proximately deprived her of a job. Her own documents and testimony establish that: (1) she is a highly controversial figure criticized even by many Republicans and members of President Trump's circle before the September 13 Episode, *see* Dkt. 150-5 at 247:19–248:3 ("I have a lot of haters."); Dkt. 153-2 (Apr. 7, 2023 E-mail from Laura Loomer to Susie Wiles); Dkt. 150-29 (reporting that "Republicans are blaming the influence of Laura Loomer" for Trump's "botched debate performance"); Dkt. 150-66 (reporting that Plaintiff's presence on the campaign "has caused anxiety among those close to the former president," with a former Trump campaign staffer calling her "an extreme liability"); *see supra* (tweets from Marjorie Taylor Greene, Lindsey Graham, and Thom Tillis); (2) she had already tried—and failed—to get a job with the Trump campaign a year and a half before the September 13 Episode, *see, e.g.*, Dkt. 150-20 at 46:11–35 (people in Trump's circle "were able to block President Trump's orders to hire me on four separate

[16] To be clear, Plaintiff's damages are not "speculative" simply because she does not know the exact dollar amount Jen Psaki earns on MS NOW. *Contra* Appellant's Br. 35. Rather, her damages are speculative because the notion that she would have gotten a job in the administration and then gotten a job as the host of a cable news program but-for the Remark is pure fantasy and conjecture.

occasions"); Dkt. 150-5 at 74:11–15 (testifying that she "was supposed to start working for his presidential campaign on April 1st of 2023" but then "did not"); and (3) countless news outlets and social media commentators were speculating about Plaintiff and President Trump having a romantic relationship before the September 13 Episode, *see supra*. Far from showing harm attributable to Defendants' conduct, as the District Court held, the evidence shows that Plaintiff's failure to secure a job in the Trump administration or as a news anchor is due to "her public remarks about controversial topics," not Defendants or the Episode at issue. Dkt. 194 at 17; *see* Dkt. 182-1, Dkt. 182-2, Dkt. 182-3.[17]

Plaintiff's failure to adduce evidence of actual injury independently compels dismissal of her defamation claims.

## CONCLUSION

For all these reasons, this Court should affirm the District Court's decision granting Defendants' motion for summary judgment.

---

[17] Plaintiff also points to three threatening emails she received that she claims show "harm to her reputation and standing as a direct and proximate result" of the Remark. Appellant's Br. 31. But none of the three mentions Maher or *Real Time*. *See id.* 31–32. Other emails she produced contained threats she received *before* the September 13 Episode.

Dated: September 30, 2026

Respectfully submitted,

*/s/ Katherine M. Bolger*
Katherine M. Bolger

Rachel E. Fugate
Yelan Escalona
SHULLMAN FUGATE PLLC
100 South Ashley Drive
Suite 600
Tampa, FL 33602
(561) 429-3619
rfugate@shullmanfugate.com
yescalona@shullmanfugate.com

Katherine M. Bolger
Alexandra Perloff-Giles
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas,
42nd Floor
New York, NY 10020-1104
(212) 402-4043
katebolger@dwt.com
alexandraperloffgiles@dwt.com

*Counsel for Defendants-Appellees Bill Maher and Home Box Office, Inc.*

## CERTIFICATE OF COMPLIANCE

(1) This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,838 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

(2) This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

/s/ *Katherine M. Bolger*
Katherine M. Bolger

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically via CM/ECF on all counsel or parties of record this 30th day of September 2026.

/s/ *Katherine M. Bolger*
Katherine M. Bolger